Thank you. Good morning, Ms. Flood.  May it please the court, my name is Allison Flood, student eligible under Local Rule 46.0F, Harvard Legal Aid Bureau, and I represent appellant Natalie Herisse. I respectfully request two minutes for rebuttal. Is that your professor next to you? Yes. Let the record show. James Berger, lawyer. Thank you. Thank you. You may proceed. We are asking this court to reverse the order of the district court, deny the petition, and refuse to send the children back to Canada. Reversal could be based on two independent errors. First, the trial judge was clearly erroneous in concluding that Canada was the children's habitual residence. And second, based on abundant, uncontroverted evidence, there is a grave risk that the children will be exposed to physical or psychological harm or an otherwise intolerable situation if returned to Canada. First, I submit that the trial judge was clearly wrong in ruling that Canada was the children's habitual residence, including erroneously substituting the required finding of shared intent with the children's supposed acclimatization to Canada. Mother and father never formed a shared intent to establish Canada as the children's habitual residence. According to two district court cases, habitual residence is not established when the removing spouse is coerced to move to or remain in a country against her will. Instead, it must entail some element of voluntariness. Mother's presence in Canada in 2010 was procured through father's coercion. Father threatened to kill M.M., who was four years old, with rat poison if mother did not travel to Canada. In response to the threat made by father to M.M.'s life, mother reluctantly traveled to Canada. This threat removed any element of choice to move to Canada. Mother's presence in Canada was also maintained by father's coercion as well. During mother's time there, she was trapped in a controlling and dominating relationship with father. Father repeatedly and forcibly raped mother, often in situations where the children were present. Was there any evidence in the record of alleged abuse by the wife with respect to the husband when they were living apart? No, your honor. There is no evidence in the record that there was any abuse by father when they were living apart. Okay, so the order to return to Canada wouldn't require that they live together. So why is there a grave risk, then, of physical or psychological harm? Your honor, this court in Walsh concluded that there is credible social science literature that establishes that serial spousal abusers are likely to be child abusers. So while the mother and father would not be living together, there is still the fact that father could potentially abuse M.M. and R.M. The fact that father has whipped his own child, B.M., with a belt in response to sexual abuse. But there's no evidence that he abused the children at issue here, right? No, your honor. But additionally, this court in Walsh stated that a long history of spousal abuse to which children are exposed in an ongoing manner presents a great risk of harm because children are at an increased risk of physical and psychological injury themselves when they are in contact with a spousal abuser. Because the record below establishes that in February 2009, father raped mother while in Canada. In summer 2010 until January 2011, father repeatedly raped mother. And the rapes continued in July 2012 until she moved to the United States, until she fled to the United States in September 2013, all while the children were present, point to the fact that if they are returned to Canada, this psychological harm that they suffered being in contact with extreme domestic violence of mother by father will just exacerbate the... the risk of spousal physical abuse. That as a matter of law, the judge lacks discretion to order return. Correct. No matter whether there's... because certainly Walsh doesn't. Walsh presents way more than that. Walsh presents evidence of the mother actually seeking protection of anger directed towards many others other than the mother. Whereas here we have a mother who, even when she was living apart, took no steps whatsoever to prevent the husband from seeing the children and eventually allowed him to move back into the home. Nor did she try to leave Canada during those 14 months. So we had none of that in Walsh. I would like to address two points that you made. First, the fact that she remained for a period of one year. I must admit that that doesn't support the fact that she chose to stay there for two reasons. One, she basically had nowhere to go. Her country of origin, Haiti, was in devastation based on a catastrophic earthquake that also ruined her residence. And secondly, the country that she would have chosen to go to, the United States, she gave up the application to remain there based on father's death threats to MM. So she reluctantly traveled to Canada based on those death threats and subsequently gave up the application status there. Is there any evidence that she reported any of these abuses to the authorities in Canada? Yes, Your Honor. Page 90 to 91 of the record states that she did in 2011 call the police who helped her flee to the apartment that she subsequently moved on when she left father's household. That is the only evidence on record. But again, mother's behavior is... Is this why the husband engages in these actions against her? She cannot seek protection from the authorities or Canadian courts? Your Honor, my client has no legal status there. So it's unclear that if she would be able to seek protection from the Canadian courts. Again, I would represent the fact that even if she could, the fact that MM's stepbrother sexually abused her while... sexually abused MM while they lived together in Canada, how is a court going to protect the child from that? If they are returned to this household, BM is going to live there. But I thought she said you agreed that they don't have to be returned to that household. That she can return to Canada and live apart from her husband or former husband. I'm sorry, I must have misunderstood the question because my client is unable... It is unclear if my client is able to return to Canada. She doesn't have any legal status there and neither do the children. So if the children were returned to Canada, they would inevitably be placed with the father because she would not be able to return there. But wouldn't that be up to the Canadian courts? I mean, the Canadian courts, whether they have a legal status or not, aren't they going to hear a claim that the children are endangered? I suppose so, Your Honor. And why wouldn't they be just as fair and in fact probably more used to handling domestic issues than would be a United States District Court judge? I mean, the fact that they didn't seek any help while they were there just speaks to the fact that my client was unaware of the fact that she could get any help while she was in Canada just because of the fact that she had no legal status. Again, I would like to represent that focusing on the sexual abuse of BM by MM, I don't believe a court can protect against that. There are three incidents in the record that are uncontroverted that BM sexually abused MM. Two of which the mother saw, one of which the aunt witnessed, and again, when the father is in his deposition, admitted to having to punish him for sexually inappropriate behavior. The father admitted that in the deposition? I don't recall that. Yes, that is in the deposition. Just give me one second. I believe it's on page A40 of the appendix. I know it's definitely in the deposition, I'm sorry, but I don't have it written down here. A46, lines 4 to 8. He admits to having punished BM for his sexually inappropriate behavior. So is that in the deposition? Is that good or bad? It's bad because he whipped him violently with a belt. Right, but if he hadn't punished him, then you'd say he's not protecting your client's children. Well, I agree with that. His method of punishment, I think, went way beyond what a parent should do to punish their child. But there's no evidence he ever, for example, administered any such punishment during the entire period of time to either of your client's children. That's correct. And so I think the difficulty you have is you want us to find that it's clearly erroneous for a judge not to find that because he did that, he's going to hurt the two children, and yet there's no evidence that he ever hurt the two children, and there's no evidence that your client behaved in a way that would suggest that she thought he was a risk to the two children while she was living in Canada. I would submit that this court in Walsh did stress the fact that even though the children weren't abused, the fact that they witnessed ongoing spousal abuse put them at a risk of psychological harm. And here, Dr. Neuberger, our child abuse expert, testified that the psychological trauma that the children experienced based on witnessing these abusive incidents on an ongoing matter, they now continue to experience today. But there's no evidence that the supposed incidents of spousal abuse would continue. You say that your client may not even be able to return to Canada, and even if she does, she could live apart, and there's no evidence that there was any spousal abuse when she was living apart from them. Correct. But returning them to Canada, a place the children associate with father's abuse of mother, is going to exacerbate the psychological trauma they've already experienced based on witnessing their father violently abuse and rape their mother over a three-year period. So while the spousal abuse will not continue because mother won't be living there, they will be living with a man that they associate that brutality with. So they could be living apart? If the children move back to Canada, it's inevitable that they'll be living with the father, because mother is unable to go to Canada. She does not have any legal status. So if the children are returned there, I don't know where else they would live. In the arrangements that we submitted to the court... When did she enter Canada the first time? She entered Canada the first time illegally. She was questioned at the border, and because of the earthquake that occurred in Haiti, she was eligible to apply for asylum, but she never did. The time lapsed. Neither party ever applied for any legal status for themselves or their children. Father does not have legal status there. RM and MM don't have legal status there, and neither does mother. Neither party applied for it, even though they had the opportunity to do so. So when she did originally go to Canada, she had the opportunity to, but no one ever ended up pursuing it. Do they have legal status in this country? I do not believe so, Your Honor. So they're in exactly the same position here? I'm sorry? As far as immigration is concerned, they're in the same position here as they would be in Canada. I'm sorry, RM does actually have immigration status here because she was born here. She was born here in 2009. I'm unsure about MM and the mother. If there's no further questions, I'll rest until my rebuttal. Thank you. Thank you.  Good morning, Your Honors. This matter involves two children that have spent almost their entire life of one child, the younger child, and half of the life of the other child in Canada. Canada is a children's home. There is no risk of grave harm to these children returning to Canada. Mr. Mueves specifically was asked had he ever harmed his children in this deposition. He said no. He was actually asked have you ever harmed the mother of these children. He said no. Mrs., the mother in question, when asked about whether Mr. had ever harmed these children, said no. In her testimony. That's before you. It's part of the record. There's no evidence of any grave risk of harm to return these kids to Canada at all that was in this record. What about the argument that if she can't go back, they'll have to go back, they'll have to live with him if necessity, and abuse from the, I guess it would be the stepbrother, would potentially be repeated? Well, first, I think it's outside of the record, but to that point, I think it's unclear whether the mom will be able to return to Canada. I think that is for the Canadian courts to make that determination. But secondly, these parties have not lived together in at least two years, and perhaps longer. That's in the record, and that was supported by the father's sister and his niece, who both testified in support of that. These parties, in fact, have moved on, effectively, from each other. They were not going to be in the same home. In fact, the father in this case is remarried and has been remarried at this point for over a year. So the fact of the matter is here, when there is a return, and hopefully mom will be able to return to Canada, if she has issue with father and his parenting, that belongs within the Canadian courts. But I guess the argument that they're making is that if the children are returned to Canada, they'll live with their father and that they will also live with the two twins that he had by a prior marriage, and that there's a risk that the twins, despite the father's efforts to prevent it, will abuse the children who are being returned, right? I would submit, Your Honor, that that evidence itself was in dispute, whether the twins were actually harmed by the father. There was evidence in the record from the months. No, I'm not talking about whether the twins were harmed by the father. I'm saying if they go back to Canada, the two children involved here will live with their father, and they will also live with his twin boys by his earlier marriage, and that they're alleging that that creates a risk of abuse of the returned children by the earlier twins. I think from a factual, I'll handle it two ways. From a factual standpoint, it's important to note that the record indicated from the niece of the father of these children, who babysat for these children, that her testimony was that there was a great relationship, there was a relationship between the twins and these two children in question, that they got along, that they played. So first and foremost, from a factual standpoint, I think there's a dispute as to whether that would even be an issue that's raised. Assuming there is, I would point out to the legal analysis, in that there's no direct harm to these children, and that's what the Hague speaks of, that's what the case law speaks of, direct harm that has to be grave to these children. And here, there is no evidence within this record that the father ever harmed these children. So therefore, the harm that may be surmised by my sister here does not meet that threshold standard, and it certainly doesn't meet the legal analysis necessary under the Hague of clear and convincing evidence. It just does not exist in the record. Do you have further questions? Going back to habitual residence, just to address that for a moment, which is the other argument that was raised by my sister in her brief, I think it's clear that the timeline here, that the fact that these parties lived separate and apart for two years, as found by Judge O'Toole, indicates that these parties had a shared intent or settled purpose. And additionally, in their brief, they point to the fact that perhaps at the beginning they may have not, and that maybe Judge O'Toole suggested that he didn't have it. And I think under recent case law by this Court, it's made pretty clear that it's at the latest time is when we need to analyze the notion of shared intent. And I certainly think that after two years, after living independent, these children going to school in Canada, these children having friends in Canada, these children having relationships and attending Sunday school and activities, they were certainly acclimatized to Canada, and it's certainly by these parties' own actions at that later time had formed that intent to remain in Canada at that point. If I have no further questions, I know it's late, I will stand on my brief. Thank you. Thank you. Ms. Flood. Thank you. I would like to first address the point that my brother discussed, the habitual residence issue. It is our understanding, based on reading the opinion, that the judge needed to find that the parties had a shared intention to establish Canada as the children's habitual residence. But rather than finding a shared intent, he circumvented shared intent in an analysis disfavored by this Court in Darren with a determination that the children had acclimated to life in Canada. It's not really clear in Judge O'Toole's opinion when he found that they formed a shared intent. His next statement in the opinion is that because the children had acclimated to life in Canada, etc., we know from this Court in Darren that it's not, you can't substitute a finding of shared intent with supposed acclimatization because when there is contrary parental intent, acclimatization of children is not enough. What about, as I understand it, the two parents actually made an agreement when she was proposing to leave Canada with one of the children, that the child would be brought back to Canada. In fact, is it a written agreement? I'm sorry, that the mother I thought the mother and the father made an agreement that she would bring the child back to Canada. I believe that's disputed. I don't believe that my client ever told But how does it help you that it's disputed? Because you're having to argue that the judge here was clearly erroneous. Well, regardless of that, he still never found there was shared intent. The first thing you have to consider in habitual residence is whether there's a shared intent. He never affirmatively stated that the parties did have a shared intent. Rather, he stated that the children had acclimated to Canada and that's why he found Canada was the children's habitual residence. So on that error, I believe that this could be reversed in order for the judge to correctly consider habitual residence based on shared intent. I would also just like to point your attention to two cases regarding sexual Before you go off there, what is the evidence that the residence is here in the United States? We're not contending that the residence is here in the United States. Petitioner just had to prove by preponderance of the evidence that Canada was a habitual residence, not where the other residences could be. We're just sitting up here today arguing that Canada was not the children's habitual residence. Wait, but in deciding whether Canada is or is not habitual residence, it would certainly be relevant to know whether or not there's evidence I mean, there must be someplace, right? We did not find case law that said that there had to be a habitual residence. I mean, this was a woman who was in a period of limbo. She didn't really have anywhere to go and no choices. Yes, she's in the United States now, and I suppose that she does plan on staying here, but her country of origin she couldn't return to. So she could move these children wherever she wants on the planet and always take the position that they have no habitual residence wherever it was she just left and they could never be returned. No, I don't think that's the point I'm trying to make. I'm just trying to make the point that Canada was not the children's habitual residence because they didn't have a shared intent. Thank you. Thank you.